Filed 6/18/21  In re Dominic L. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re DOMINIC L. et al., Persons Coming Under Juvenile Court Law. | B306883 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP02431A-D) |
| Plaintiff and Respondent, | |
| v. | |
| JOANNA S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jana M. Seng, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Rodrigo Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

In the proceedings below, the court sustained three counts of a petition filed by the Los Angeles County Department of Children and Family Services (DCFS) under Welfare and Institutions Code section 300, subdivision (b)(1) (Section 300(b)(1)) and found jurisdiction over four minor children of appellant-mother Joanna S.[1] Count b-1 alleged that Mother had endangered her son Dominic L. by physically abusing him. Count b-3 alleged that Mother's substance abuse endangered the minors. And count b-6 alleged that Ivan L., father of two of Mother's children, endangered the children with his substance abuse.[2] After finding jurisdiction, the court removed the minors from Mother, ordered her to participate in a drug program and attend counseling to address anger management, and granted her monitored visitation (vesting DCFS with discretion to "liberalize" the visitation).

---

[1] Mother also has an adult daughter, Alexis. Undesignated code references are to the Welfare and Institutions Code.

[2] Ivan is not a party to this appeal.

2

On appeal, Mother argues the court erred in: (a) finding jurisdiction due to her substance abuse because she did not abuse drugs, and even if she did, her abuse did not harm the minors; (b) finding jurisdiction due to her alleged physical abuse of Dominic because the court had found the evidence insufficient to sustain identical physical abuse allegations pled under section 300, subdivision (a); (c) finding jurisdiction due to Ivan's substance abuse because as a non-custodial parent who played no part in the minors' lives, his substance abuse did not endanger them; (d) removing the minors from her because there was insufficient evidence they were at risk in her care, and there were means short of removal to protect them; and (e) ordering her to attend anger management and a drug program, and granting her only monitored visits.

We conclude that: (a) substantial evidence supports finding that Mother's substance abuse endangered the minors; (b) because we find the court did not err in finding jurisdiction due to Mother's substance abuse, we need not consider whether jurisdiction was also proper due to her alleged physical abuse; (c) Mother lacks standing to appeal findings made regarding Ivan; (d) substantial evidence supported removing the minors from her custody; and (e) the court did not abuse its discretion in ordering her to attend the programs it did, or in granting only monitored visitation with discretion to liberalize. We affirm.

## STATEMENT OF RELEVANT FACTS

### A.    *The Family*

The four minor children relevant to this appeal are: Dominic L. (born in June 2006), Julian L. (born in June 2008), Leila H. (born in February 2015), and Xavier S. (born in October 2018).  Ivan L. is the father of Dominic and Julian.  Isaac H. is the father of Leila and Xavier.  Mother reported that she had full custody of Dominic and Julian after Ivan relinquished his parental rights.  DCFS was unable to locate Isaac, and he did not participate in the proceedings below.

### B.    *Prior Child Welfare History and Criminal Record*

In January 2009, DCFS received a referral for physical abuse and general neglect regarding Julian, because he had suffered an unexplained parietal skull fracture.  The referral was closed as unfounded.  In October 2019, DCFS received a referral for emotional and physical abuse and general neglect from the maternal grandmother (MGM), alleging that Mother had threatened her, and that Isaac would hit Dominic and Julian.  Mother claimed MGM was upset due to the inheritance she received from the maternal grandfather (MGF).  DCFS then lost contact with the family, and the referral was closed as inconclusive.

A criminal history search for Mother "reveal[ed] a DUI in 2012, and warrant for grand theft in 2019."  She also was

4

cited on March 26, 2020, for driving with a license suspended because of a DUI.[3]

### C. *DCFS Investigates a Referral*

On March 25, 2020, DCFS received an "immediate response" referral alleging that the reporting party had received a text message that morning from Dominic, attaching a picture of a bag containing methamphetamine. Dominic explained that the previous day, Mother had left the home for four hours and he had found the methamphetamine in a box Mother had left behind. Dominic further stated Mother had been smoking marijuana the night before in the children's presence, and that in the morning he saw her smoking methamphetamine. The reporting party had taken the children to MGM's home, and was concerned Mother would attempt to retrieve them once she realized they were gone.

#### 1. MGM, Alexis, and the Children

A children's social worker (CSW) visited MGM's home the same day, and spoke with MGM, the children's adult sister Alexis, and the children.

MGM stated Mother had a history of physically abusing Dominic. Mother had lived with MGM and MGF before he passed away, and MGM believed Mother had been

---

[3]     The record is silent on when her license was suspended, and the circumstances surrounding the DUI.

using drugs during that time; she "would steal everything" and "wouldn't sleep at night." MGM also explained she was in litigation with and had obtained a restraining order against Mother, because Mother had tried to put the house and MGF's business in Mother's name after MGF's death, and Mother had been telling others that MGM was "'going to be gone soon.'"

Alexis stated she did not get along with Mother because Mother would choose her boyfriends over her children. She kept in contact with Mother only so she would not lose contact with her siblings. Mother's loss of weight and paranoia led Alexis to believe Mother could be using drugs. When she was younger, Alexis had found a pipe in Mother's sweater. Alexis indicated Mother was homeless, and living in an Airbnb.

Dominic, then 13, told the CSW he had not attended school since July 2019, when MGF passed away. Regarding Mother's drug use, he confirmed he had seen Mother with "'bags of crystals, maybe,'" and that she had been using crystal meth since MGF's death. He reported she kept her drugs and pipe in a "tissue box" that was with her at all times. When Mother used drugs, she behaved aggressively and picked fights with Dominic. Dominic reported that two weeks earlier, Mother had thrown a DVD player at him and spat on him. He also claimed Mother's boyfriend pushed him. Dominic wanted to live with MGM, and was afraid to return to living with Mother, stating he did not "want a relationship with his mother because they never had a

6

relationship to begin with." Dominic stated his father was not involved in his life.

Julian, then 11, stated he had not attended school in over five months. He reported he found Mother's bag of methamphetamine and Alexis took a picture of it. He claimed Mother had been using methamphetamine for a "couple of months" and did so while locked in the bathroom. Julian stated he knew Mother was using methamphetamine because afterward, she would not talk and would "'clean[] like crazy.'" He confirmed Mother would yell and spit at Dominic. Julian also expressed a desire to stay with MGM, because he was tired of moving from Airbnb to Airbnb, and feared Mother would be upset at the children for "showing the meth . . . ."

Five-year-old Leila stated that Mother spanked Dominic. She did not know what "drugs" were. Xavier was too young to make a statement.

### 2. Mother

The CSW met with Mother the same day. Mother told the CSW she had been at home with the children, and Alexis had insistently asked to come see them. Leila and Xavier were sick, so she agreed to let Alexis visit while Mother went to the store. Though Mother was absent for only 10 minutes, Alexis and the children were gone when she returned. Mother called Alexis, and after discovering the children's whereabouts, went to MGM's home but could not enter because of the restraining order; she called law enforcement

7

instead.  Law enforcement refused to do anything and told Mother to wait for a social worker to speak with her.  Mother stated that Alexis had sent her a picture of the drugs she claimed to have found in the home, but denied they were hers, surmising they may have been left by the previous tenants, or that perhaps someone "set [Mother] up . . . ." Mother explained that she moved from one Airbnb to another because MGM had kicked her out of her home after learning that MGF had put the home in Mother's name when he passed away.  Mother denied ever using drugs, and agreed to submit to a drug test the next day.  She confirmed the children were not going to school, but claimed to be homeschooling them while she worked on enrolling Dominic and Julian in a school in West Covina.  Mother expressed concern with the children's placement with MGM, claiming MGM would "turn them against her."

### 3. Others

The CSW spoke with Mother's friend Gail and her cousin Crystal.  Both had no concerns about Mother using drugs or taking care of the children, and both opined that MGM was "evil."  Maternal uncle Fabian also voiced no concerns that Mother used drugs.

After these conversations, the CSW informed Mother that Dominic and Julian could stay with Fabian starting the next day (but would spend the night with MGM), and that Mother could retrieve Leila and Xavier from MGM's home. Because of the restraining order preventing Mother from

8

contact with MGM, the CSW advised her to enlist help from law enforcement.

### 4. Subsequent Events

The next day, Mother was scheduled for a drug test, but she stated Leila and Xavier were sick, and Mother felt sick as well. She nevertheless drove to the testing facility, but arrived late and was not allowed in. The staff was also unhappy because she was showing symptoms of a cold. She subsequently tested negative five days later.

On April 2, Mother informed the CSW that Fabian had never retrieved Dominic and Julian from MGM. The CSW agreed to call Fabian to let him know Mother was permitted to retrieve Dominic and Julian, but on this call, Fabian remarked, "'I guess it's okay for them to go back to her even though she is a meth head.'" When asked what he meant, Fabian explained MGM had told him Mother was using methamphetamine, and that the children could tell the CSW where Mother got her drugs. He further explained he had previously stated he was unconcerned that Mother had used drugs because he thought the CSW was an "'assessor.'"[4]

Five days later, the CSW asked Mother to drug test again because her family almost uniformly alleged she was using drugs. Mother initially agreed but then backtracked, stating she was unsure if she could make it because her car "'blew up'" the previous night and she was still trying to

---

[4] The record is silent as to what Fabian meant by this.

arrange for its repair and other transportation. Mother later told the CSW she did not understand why she was required to drug test again when she had already tested negative, and that the CSW should have realized her family was fabricating the allegations.

The CSW spoke again with Dominic and Julian on April 22. Dominic confirmed his previous story, and added that he had seen methamphetamine and multiple pipes in Mother's room in different Airbnbs. He stated Mother would develop a "weird fear of people watching her" after using methamphetamine. He also stated Mother had sold his bicycle to buy drugs, and that on one occasion she brought him and his siblings to a hotel to buy drugs, and then left them in the car for over an hour. He stated Mother had a box of allergy pills and inside that box was a small bag with what looked like crystals. Regarding the incident that caused the referral, Dominic explained that he and Julian had shown the baggie of methamphetamine to Alexis when she had come over to care for them. He also claimed Mother's boyfriend hit him with Mother's permission, and added that when Mother threw a DVD player at him, it hit his hand but left no marks or bruises.

Julian also largely confirmed his previous story. He stated he had found a baggie the previous day in a bathroom cabinet and had hidden it on top of the bathroom shelf. He then showed it to Alexis who took a picture of it. Alexis called the police and the police let her bring the children to MGM's home. However, Julian claimed that he became

10

scared Mother would discover he took the baggie, so he flushed it down the toilet. He also stated he had seen Mother use methamphetamine once in the bathroom, and Mother told him to close the door and knock the next time.

### D. *DCFS Files a Petition*

On April 28, 2020, the court granted a removal order for the children. Two days later, DCFS filed a petition on their behalf, under section 300, subdivisions (a), (b)(1), and (j).

Counts a-1, b-1, and j-1 identically alleged Mother had abused Dominic by throwing a DVD player at him, which struck his hand; spitting on him; and otherwise striking him. Counts a-2, b-2, and j-2 identically alleged that Isaac abused Dominic by pushing him, and that Mother knew or should have known of the abuse and failed to protect him. Count b-3 alleged Mother was a current abuser of methamphetamine, amphetamine, and marijuana, rendering her incapable of caring for the children, and that she had used and possessed drugs while caring for them. Count b-4 alleged Mother's methamphetamine and other drug paraphernalia were accessible to the children.

In May 2020, the court found a prima facie case to detain the children. Dominic and Julian were detained with MGM, and Leila and Xavier were detained with Mother's cousin, Crystal. Mother was granted monitored visits, and ordered to participate in drug testing.

11

### E. *DCFS Continues to Investigate*

A dependency investigator (DI) spoke with the children, Mother, and several other parties.

### 1. Dominic

Dominic reiterated his previous statements and also stated that Mother would frequently fight with and hit him because he wanted to live with MGM. He explained that while the family was at a hotel, Mother threw a DVD player at him in reaction to his desire to return to MGM's house, and his accusation that Mother wanted the children around only because she "g[o]t money from" them. He clarified the DVD player had hit his arm because he had raised it to block the player from hitting him. Dominic related another incident in which he fell when attempting to pick up Leila and Isaac shoved him, and Mother spit on Dominic when he threatened to tell a social worker.

Regarding Mother's alleged drug use, he claimed she began using drugs as soon as they moved from MGM's house. He stated she would always lock the bathroom door, but one day it was left open and he entered and saw a pipe and three plastic baggies containing clear crystal powder. Dominic texted a picture of it to Alexis's boyfriend and he told them to return the drugs to where he found them. Julian combined the three bags into one.

### 2. Julian

Julian confirmed Mother would hit Dominic. Julian stated he was present at the incident in which Mother threw a DVD player at Dominic, and another incident in which Mother spat at him. Regarding Mother's drug use, Julian recounted that when they were living in an Airbnb by Northview, he heard a lighter flick in the bathroom and then a cabinet close. After Mother exited, he went inside, opened the cabinet, and saw a long pipe that was curved at the end alongside a little baggie with crystal meth inside. On a separate occasion, in a different house, he walked into the bathroom and saw Mother smoking a pipe; she chastised him for not knocking. Julian believed Mother had been using drugs ever since they moved out of MGM's house. He stated her methamphetamine was stored in a tissue box and "'[o]ne time the baby almost got it.'" Regarding the incident that occasioned the referral, Julian stated he had found one small baggie of methamphetamine in the bathroom and texted a picture of it to Alexis.

### 3. Mother

Mother denied the allegations. She stated the family did not own a DVD player, and had never been in a hotel. She denied ever hitting the children, and claimed MGM was coaching them. Mother's drug tests, taken on March 31, May 21, May 27, June 5, June 12, and June 17 were all negative. She also questioned how the children could have texted the picture of the methamphetamine to Alexis, given

13

that they did not have a phone, and the hand in the picture holding the baggie belonged to Alexis. As for the origins of the drugs, Mother opined they may have come from MGM's house, as the boyfriend of a maternal aunt used methamphetamine. Mother claimed MGM was manipulating the situation because after MGF died, the house MGM was living in was given to Mother, and Mother notified MGM she was going to sell it, causing MGM to obtain a restraining order.

As to the missed drug test on March 26, she told the DI that she had only gotten Leila and Xavier back around midnight the previous night, and they had slept until the afternoon the next day. Then, on the way to the drug testing site, she was pulled over by a police officer who questioned where her drugs were. She arrived at the testing site at 7:03 p.m., and was informed they closed at 7:00 p.m. They were also upset that she had a cold.

Mother's monitored visits with Leila and Xavier were going well -- she arrived early, brought toys, activities, food, and snacks, and engaged, interacted, and played with the children. Dominic and Julian refused to visit with Mother.

### 4.    Ivan

During the interview with the DI, Ivan appeared to be "stressed out, slow, incoherent and confused." He stated he had never seen Mother hit her children, and it did not seem "'typical'" of her behavior, but admitted he had not been around the children for years. He also claimed Mother had

14

"'been using meth since before I met her. I used tequila[,] she used meth. Towards the end of the relationship she started to drink. Her behavior was erratic.'"

### 5. MGM

MGM stated that a neighbor once told her that "the guy that visits [Mother] delivers her drugs." MGM also was informed of an incident in which Leila had a pipe and, when asked about it, stated it was "for her mom's medicine."

### 6. Alexis

Alexis stated that the day before the referral, Julian had handed her a bag of methamphetamine, and she told him to put it back. The next day, she went to their house and talked to the children about potentially being placed in foster care if she reported the drugs, and the children stated that would be okay. Alexis called the Sheriff's Department and was told she could take the children. Alexis stated that when they were all living together, she donned Mother's sweater once and there was a pipe inside. Additionally, when Leila was two years old, she found a pipe. Alexis stated that Mother would throw tantrums, stomp her feet, and was "'super paranoid.'"

### 7. Crystal

Originally, Leila and Xavier were placed with Crystal, who had agreed with Mother that she would care for them as long as Mother complied with court orders. However, after

15

Mother came to her home unannounced, Crystal told her to leave because the visits were unauthorized. Since that time, Mother harassed and disrespected her, and Crystal suspected Mother was under the influence of narcotics. Leila and Xavier were subsequently moved to MGM's home on May 27, 2020.

### 8. Joseph (Maternal Uncle)

Joseph stated he never saw Mother use drugs, "'but I heard and I just knew. I know what it looks like to use. She wouldn't sleep at night and her eyes were red and glazing. [Mother] was working with my dad and he had co-workers to help with jobs. One of them told my brother that [Mother] . . . would have parties at the shop and use.'"

### F. *DCFS Amends the Petition to Add Ivan*

In early July 2020, DCFS filed a first amended petition, adding two counts under Section 300(b)(1). Count b-5 alleged that Ivan had mental and emotional problems rendering him unable to care for Dominic and Julian. Count b-6 alleged that Ivan had chronic substance abuse issues rendering him unable to care for Dominic and Julian. On July 16, 2020, the court found a prima facie case to detain the children from Ivan.

## G.   *Adjudication / Disposition*

In late July 2020, the court held a combined adjudication and disposition hearing. No witnesses testified. Before the court were counts a-1, b-1, and j-1 (alleging Mother physically abused Dominic by, among other things, throwing a DVD player at him), a-2, b-2, and j-2 (alleging that Isaac abused Dominic), b-3 (alleging that Mother's substance abuse endangered the children), b-4 (alleging that Mother's drugs and drug paraphernalia were accessible to the children), b-5 (alleging Ivan's mental issues endangered his children), and b-6 (alleging Ivan's substance abuse issues endangered his children).

Dominic and Julian's counsel declined to argue counts a-2, b-2, and j-2, but asked the court to sustain all other counts. Leila and Xavier's counsel also declined to argue counts a-2, b-2, and j-2, and additionally declined to argue counts b-5 and b-6 because they pertained to Ivan, who was not his clients' father; he asked the court to sustain all other counts. Mother's counsel asked the court to dismiss the petition, contending the entire situation arose from the conflict between Mother and MGM, and pointing to Mother's negative drug tests and the inconsistencies in the statements regarding the descriptions of Mother's behavior. Ivan's counsel asked the court to dismiss the counts pled against him because there was no proof that his mental health or substance abuse issues were harming his children, he did not seek custody, and he wanted only monitored visitation. After the court indicated it intended to sustain

17

counts b-1 and b-3 (into which it would incorporate count b-4), DCFS's counsel declined to argue count a-2, but requested the court also sustain counts a-1, b-2, b-5, and b-6.

Ultimately, the court sustained three counts (b-1, b-3, and b-6), and found jurisdiction under Section 300(b)(1).[5]

---

[5] As sustained, count b-1 alleged Mother "physically abused the child Dominic. On a prior occasion, the mother . . . threw a DVD player at the child, striking the child's hand. On prior occasions, the mother spit at the child. On prior occasions, the mother struck the child. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The physical abuse of the child Dominic by the mother . . . endangers the child's physical health and safety."

As sustained, count b-3 alleged Mother "is a current abuser of methamphetamine, which renders the mother incapable of providing regular care and supervision of the children. On prior occasions, the mother used, possessed and was under the influence of methamphetamine, while the children were in the mother's care and supervision. On prior occasions, methamphetamine and drug paraphernalia were found in the children's home and within access to the children. The children Leila and Xavier are of such a young age as to . . . require constant care and supervision and the mother's substance abuse interferes with providing regular care and supervision of the child. The mother's substance abuse endangers the children's physical health and safety and places the children at risk of serious physical harm and danger."

As sustained, count b-6 alleged Ivan "has a[] chronic and unresolved history of substance abuse . . . . The father's substance abuse renders him incapable of providing regular care for the children . . . , endangers the children's physical health and safety, and places the child at risk of serious physical harm and damage."

18

Moving to disposition, the court ordered monitored visitation but no reunification services for both Ivan and Isaac. As to Mother, the court ordered her to complete a drug program and submit to random, on-demand testing every other week, participate in conjoint counseling with Dominic and Julian, take parenting classes, and participate in individual counseling to address anger management and case issues. While the court agreed Mother should be credited for the drug program that she was participating in, and ordered DCFS to assess that program, it made clear that it wanted Mother to complete a "full drug and alcohol program" and directly instructed Mother to complete a "12-step program with court card and sponsor . . . ." Finding clear and convincing evidence that there would be a substantial danger to the children's safety if returned to Mother's custody, that DCFS had made reasonable efforts to prevent removal, and that there were no reasonable means to protect the children, the court ordered them to remain with MGM, and granted Mother a minimum of three hours of monitored visits, three times a week.[6] Mother timely appealed.

## DISCUSSION

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*In re J.K.* (2009) 174

---

[6] DCFS was vested with discretion to "liberalize" the visitation.

Cal.App.4th 1426, 1433.) Under a substantial evidence review, "'we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) "Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

## A. *The Court Did Not Err in Finding Jurisdiction Due to Mother's Substance Abuse*

Citing statements from Dominic, Julian, Ivan, Fabian, and Alexis, the court found that Mother had abused and was currently abusing methamphetamine. The court additionally found that leaving methamphetamine accessible to the children placed them at risk. It therefore found the children to be dependents under Section 300(b)(1). Mother argues the court erred in doing so because: (1) substantial evidence did not support finding she was a substance abuser; (2) the statements from Dominic, Julian, and Fabian changed throughout the investigation, and contradicted her negative drug tests; and (3) even if she were a substance abuser, the children were not endangered because she was still able to regularly care for them. We disagree.

20

1.  **Substantial Evidence Supported Finding Mother Abused Methamphetamine**

Mother argues insufficient evidence supported finding she was a substance abuser based on the standard set forth in *In re Drake M.* (2012) 211 Cal.App.4th 754. There, our colleagues in Division Three held that "a finding of substance abuse for purposes of section 300, subdivision (b), must be based on evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the DSM-IV-TR." (*Id.* at 766.) However, as our colleagues in Division Seven have noted, while the "*Drake M.* formulation [is] a generally useful and workable definition of substance abuse for purposes of section 300, subdivision (b). . . , it is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court, and we are unwilling to accept [the] argument that only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM-IV-TR categories can be found to be a current substance abuser." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218.) We agree with *Christopher R.*

Here, virtually everyone around Mother alleged she was abusing drugs. MGM recounted that when Mother was living in her home, a neighbor informed her that Mother had drugs delivered by a frequent visitor. MGM also reported

21

that during this period, Mother would "steal everything" and "wouldn't sleep at night." Mother's brother Joseph confirmed Mother would not sleep and that her eyes appeared "red and glazing." Ivan stated Mother had been using methamphetamine since before he met her (i.e., since before Dominic's birth). Even Crystal, who had originally claimed no knowledge of any drug use on Mother's part, came to believe her changed behavior resulted from the use of narcotics.

Mother's older children also gave statements confirming Mother's drug use. Alexis found a pipe in Mother's sweater when she was younger, and noted Mother lost weight and acted paranoid. Dominic stated Mother had been using methamphetamine since MGF had died in July 2019, and he had seen methamphetamine and pipes in more than one of the Airbnbs in which the family stayed. Mother's drug use caused her to behave aggressively and pick fights with him, and to develop a "weird fear of people watching her . . . ." She also sold his bicycle for drug money and left him and his siblings in a car for over an hour while buying drugs. Julian echoed that Mother had been using methamphetamine for "a couple of months," and attested that they caused her to be silent and "'clean[] like crazy.'" On this record, we find substantial evidence supported the court's finding that Mother abused methamphetamine.[7]

---

[7] Moreover, as stated in *Drake M.*, the American Psychiatric Association, Diagnostic and Statistical Manual of Mental

## 2. Evidence Potentially Supporting a Finding Mother Did Not Use Drugs Is Irrelevant

Though Mother does not deny the existence of the evidence discussed above, she contends many of the statements regarding her drug use were inconsistent, suggesting the witnesses were manipulated by MGM. She also cites her denials of drug use and her consistently negative drug tests. Mother's argument amounts to an

---

Disorders (DSM-IV) defines "'substance abuse'" as a "'maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period: [¶] (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household).'" (*In re Drake M.*, *supra*, 211 Cal.App.4th at 766.) In discussing the criteria used to diagnose a substance abuse disorder, the DSM-5 (which superseded the DSM-IV (*In re Christopher R.*, *supra*, 225 Cal.App.4th at 1218, fn. 6)) states that "Recurrent substance use may result in a failure to fulfill major role obligations at work, school, or home (Criterion 5). The individual may continue substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (Criterion 6)." (Am. Psychiatric Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013), p. 483.) Here, it is undisputed that Dominic and Julian had not been enrolled in school for several months, despite clearly being of school age. Thus, even were we to consider the DSM definitions of "substance abuse," Mother appears to fit at least one criterion listed in the DSM-IV, and two criteria listed in the DSM-5.

improper request that we reweigh the evidence. "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

While the statements attesting to Mother's drug use were not always consistent in their details, the basic gist of the statements remained unchanged: Mother had been using drugs for at least several months, and her children discovered drugs or drug paraphernalia (or encountered Mother using drugs) more than once. On one such occasion, Dominic and Julian discovered a baggie containing methamphetamine and Alexis either took or received a picture of it. Therefore, that some evidence may have supported a finding that Mother did not abuse methamphetamine is of no import when other evidence

24

substantially supported the finding the court made.[8]  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 [when "'"two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court"'"].)

### 3.    Substantial Evidence Supported Finding That Mother's Conduct Endangered the Children

Mother argues that even if she did abuse methamphetamine, the court erred in finding such conduct endangered the children because she was still able to regularly care for them.  But "a child's ingestion of illegal drugs constitutes 'serious physical harm' for purposes of section 300."  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 825, abrogated on other grounds in *In re R.T.* (2017), 3 Cal.5th 622, 629.)  Therefore, when a parent creates a substantial risk that her child will ingest drugs, jurisdiction is proper under Section 300(b)(1).  (*In re Rocco M.*, *supra*, 1 Cal.App.4th at 825 [trial court could reasonably find that parental conduct created substantial risk child would ingest drugs "by placing or leaving drugs in a location or locations where they were available to" child or "by exposing [child] to

---

[8]    Further, while Mother accused MGM of orchestrating a conspiracy due to their legal dispute, she fails to explain what incentive Ivan, Fabian, Joseph, or Crystal would have had to join this conspiracy.

25

her own drug use, thus impliedly approving such conduct and even encouraging [child] to believe that it is an appropriate or necessary means of coping with life's difficulties"].)

Here, substantial evidence supported finding that Mother placed or left drugs in locations accessible to the children, and that she exposed them to her drug use. There is also evidence in the record that Dominic and Julian had not attended school for several months, that Mother sold Dominic's bicycle for drug money, and that Mother once left the children unsupervised in a car for over an hour to buy drugs. Therefore, regardless of whether she used or abused methamphetamine, her conduct placed the children at substantial risk of serious physical harm, and jurisdiction was proper.[9]

---

[9] Mother argues that the facts of *In re Drake M.* and *In re David M.* (2005) 134 Cal.App.4th 822 support reversal. Both cases are inapposite because in neither case did the child have repeated exposure or access to drugs. (*In re Drake M., supra,* 211 Cal.App.4th at 768-769 ["There was no evidence showing that Drake was exposed to marijuana, drug paraphernalia or even secondhand marijuana smoke"]; *In re David M., supra,* at 831 ["SSA offered no evidence that David was endangered, much less harmed, while under [babysitter] Teresa's care, or that David was exposed to drugs, drug paraphernalia, or even secondhand marijuana smoke"].)

**B.**  *Other Bases for Jurisdiction*

In addition to finding jurisdiction under Section 300(b)(1) due to Mother's drug use and exposure of the children to drugs, the court also found jurisdiction based on Mother's alleged physical abuse of Dominic, and Ivan's substance abuse.  Mother argues that the court erred in doing so.

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E., supra,* 171 Cal.App.4th at 451.)  Because we have found that jurisdiction under Section 300(b)(1) was proper due to Mother's substance abuse, we do not consider whether jurisdiction would also have been proper due to any other basis.

Additionally, Ivan has not appealed the court's finding of jurisdiction based on his substance abuse.  Code of Civil Procedure section 902 provides that "Any party aggrieved may appeal in the cases prescribed in this title."  This section applies to dependency proceedings.  (*In re Nachelle S.* (1996) 41 Cal.App.4th 1557, 1560.)  Mother fails to explain how the court's finding jurisdiction due to Ivan's substance

abuse "aggrieved" her.  She lacks standing to challenge this finding.

## C. *The Court Did Not Err in Removing the Children*

Finding clear and convincing evidence that there would be a substantial danger to the children's safety if returned to Mother's custody, and that there were no reasonable means to protect the children short of removal, the court ordered the children to remain with MGM, and granted Mother monitored visits.

Mother contends the court erred in this finding because she had a clean and organized home, she cooperated with DCFS in making a safety plan, she consistently tested negative for drugs, and she had positive visits with Leila and Xavier.  Additionally, she contends reasonable alternatives existed to protect the children from harm while in her custody, such as continued random drug testing, unannounced home visits, and wraparound services.  We disagree.

The same evidence that supported jurisdiction over the children also supported their removal -- Mother repeatedly left the children in situations where they had access to methamphetamine, and also used methamphetamine while they were in her care.  Given her consistent denial of having a drug problem, these problems would likely remain unaddressed.  (*In re Gabriel K.* (2012) 203 Cal.App.4th 188,

197 ["One cannot correct a problem one fails to acknowledge"].) Returning the children to a substance abuser in denial would have constituted a substantial danger to them.

Nor do we think Mother's proposed methods would have sufficiently protected the children. While drug testing and unannounced home visits could increase the chances of "catching" Mother with drugs, they would do little to mitigate the children's exposure to them. As to "wraparound services" being a reasonable alternative to removal, Mother fails to explain what services she thinks would have served to protect the children and has thus forfeited this argument. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["We are not required to examine undeveloped claims or to supply arguments for the litigants"].)

### D. *The Case Plan Was Not an Abuse of Discretion*

Mother argues the court abused its discretion in: (1) ordering her to counseling for anger management because she was not an abusive parent; (2) ordering her to participate in a "full drug treatment program" when she was already enrolled in an outpatient program and consistently tested negative; and (3) requiring monitored visitation when her visits with Leila and Xavier had been "positive and appropriate . . . ." We discern no abuse.

Dominic and Julian both reported that Mother yelled at, fought with, and hit Dominic. MGM claimed Mother had

29

a history of physically abusing Dominic. Given this evidence, the court did not exceed the bounds of reason by ordering Mother to be counseled for anger management.

While the court agreed Mother should receive credit for the drug program in which she was participating and ordered DCFS to assess that program, it made clear that it wanted her to complete a "full drug and alcohol program" and directly instructed Mother to complete a "12-step program with court card and sponsor." Given the number of allegations that Mother was abusing or had abused methamphetamine for several months if not longer, and that Mother still denied she had ever used drugs, it was well within the court's discretion to order Mother to participate in a "full drug treatment program."

Finally, that Mother's monitored visits with Leila and Xavier had thus far been positive and appropriate did not render unreasonable the court's decision to order monitored visits. Given Mother's drug issues and her denial that she had any such issues, that she had not yet completed a drug program and had only a short history of negative tests, and that Leila and Xavier were of such a young age, the court was well within reason to require that Mother's visits be monitored, especially when DCFS was vested with the discretion to "liberalize" those visits.

**DISPOSITION**

We affirm the court's jurisdictional and dispositional orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

31